As you know, for the record, my name is Rochelle Wadivia, and I'm representing the Petitioner, who is Mr. Ndom, and is present in the courtroom today. Thank you, Your Honor. I'd just like to state at the outset that I'd like to request three minutes for rebuttal. Okay. We'll try to help you, and you try also to keep track of your time. Okay. Thank you, Your Honor. First of all, I wanted to just start off by first stating that, of course, that the respondent, the judge in this case, the court, of course, is reviewing the decision of the immigration judge because the Board of Immigration Appeals, as you're aware, adopted without any opinion or comment the decision of the immigration judge. And in that case, the judge found that the respondent was credible. And we know that from the case law that once the respondent is found credible, all the testimony is taken as to be true. Now, what's important about that is, of course, well, and then the judge went on further to say that in his analysis that he didn't believe that the respondent had established a past persecution. And then in his analysis of the well-founded fear, he stated that there was civil strife and perhaps some sort of terrorist activity that would have been committed, and that was the reason why he didn't go on to grant the respondent his request for asylum. And just to note again that the immigration judge noted specifically that the testimony of the respondent was consistent with the country condition reports. And those country condition reports that we're referring to are the Department of State reports and also the profile of asylum claims. The petitioner noted in his brief that the profile of asylum claims specifically states that most of the requests for asylum from the Cosmonauts region are based on political opinion, not whatever we're saying is civil strife. And that was a concern that I had about the judge's opinion is because we don't really know what civil strife is. I mean, what is the legal standard for civil strife? How does the judge reach a conclusion that there is civil strife that would operate effectively as a bar to an asylum claim? Or more than how does he decide what it is, what is it? Pardon me, Your Honor? What is it? Aside from how he decides what it is as a procedural matter, it's a little mysterious because it seems to – on the one hand, we have the civil strife standard. On the other hand, we have the patent and practice standard. So if there's lots of persecution, that seems to enhance the claim of persecution. But if there's civil strife, whatever that is, it detracts from it. So what's the difference between civil strife and a patent and practice discrimination of persecution? And I think, Your Honor, that this is exactly the position that the Petitioner is in. The judge cited no case law whatsoever to support his conclusion that there was civil strife here. But I would suggest to the Court that if we're going to talk about civil strife, then we ought to look at whether or not – I mean, whatever that is, because I really don't know what that is. I haven't found any case law or any analysis that would give us some sort of definition or standard to apply or test to be able to make a determination that there is civil strife that would operate as a bar to asylum, which is what's happening here. But I would suggest to the Court that if it were to provide us with the clarity on this guidance on this issue, that that would be very important. But in this case, I wouldn't say there was civil strife because the respondent, on account of, is clearly here. It's clearly present. The respondent is a member of a protected social group. He lived in that social group I've defined as being a resident of the Kosmonauts region. Based on his being a resident, native or inhabitant of the Kosmonauts region, then he's being imputed a political opinion by the current government. Now, on the other hand, as a resident native of the Kosmonauts region, the MPDC, if he does not cooperate with them, is being imputed as being a supporter of the government. So in our position, that we would look first to whether or not the respondent meets the on account of standard. And is he a member of a protected group? Has he expressed a political opinion? Or is there a political opinion that's being imputed to him? Isn't part of what the I.J. seemed to be saying was that when he was accused of rebellious manifestations or whatever the terminology was, that he was essentially being accused of himself having engaged in activity against the government as opposed to simply holding an opinion? Well, I think that the I.J. was stating that there may have been some allusion to anything that he would sort of classify as a terrorist activity. Once again, I think that that's a very vague term that's used in the opinion. But I'd like to preface that by saying that he was. I mean, is that a political opinion? Suppose he was actually engaged in activity opposed to the government as opposed to simply going to meetings to oppose the government. Would that, if he were jailed for that reason, would that be persecution or not? If he was actively engaged in activity against the government. Well, I think we'd have to look at the nature of the activity, Your Honor. Well, I mean, violent activity or, you know. Well, in this particular case, the respondent was between 15 and 18 years old. And in this case, I would analogize him to being the likes of a child soldier. He became involved in this organization at a time when he was very impressionable. And he stated in his testimony that he had to carry out, he did duties, like he would carry a bag somewhere or something. In this case, he later learned that there was some sort of explosive device in there. But I would look, Your Honor, to whether or not there was intent on the part of the person to engage in any kind of activity that's opposed to the government. Violent activity. But I'm asking a slightly different question. If the government arrested him because they thought he was carrying explosives, whether he was or wasn't, is that persecution? Is that a hypothetical, Your Honor? Is that persecution? Would that be a hypothetical because that has the maximum effects of this case? Well, no. It's not entirely a hypothetical because my understanding of what the I.J. thought happened here was he was, may have been that, i.e., that he was arrested because he was believed to have done rebellious things as opposed to harbored a rebellious opinion. Well, there was two things that the I.J. said. I mean, first of all, let's remember that when he was arrested, it was after there was an insurgent. Every time there was an insurgent, the petitioner was arrested. So there's a nexus there between what the government believed the political opinion of the petitioner was, because at other times they left him alone. Whenever there was an insurgent, let's go find that guy that we think is a supporter of the NPDC. Let's arrest him. Let's question him. Let's shackle him. Let's not allow him to go to the bathroom. And let's question him. Now, so there's definitely a nexus here between the political opinion of the Respondent or the petitioner. Are the insurgencies, this is all very interesting, actually, but are the insurgencies that we're talking about demonstrations in the streets or violent activity? I don't think that was clear from the record, Your Honor. It was insurgents, and each time there was an insurgency from the NPDC. Now, there were two things with the NPDC, as you're aware. There was a violent arm and there was a nonviolent arm. There was no evidence in the record that the petitioner ever was a part of any kind of violent activity. But I would use, Your Honor, in response to your question, I would look to see, I would look at a reasonable cause for arresting anyone. And that's the standard that we use in our law. Let's look at what we have a probable cause or reasonable cause to believe that he's actually participating in any rebellious, any violent activity. Well, the standard is pretty strong under Elias Zacharias. What is there in the record that compels the conclusion that the I.J. was incorrect? I'm sorry, I didn't hear the first part of your question, please. Under Elias Zacharias, the standard is pretty strong. We have to be convinced that the record compels a different conclusion. What in this record compels a different conclusion? Thank you, Your Honor. That really gets to the heart of why we're here today. The two things that I believe that compel a different conclusion are, first of all, that when the petitioner was in jail, a government official came to him, told him, the next time you come here, if we arrest you again, you're going to die. We're going to kill you. So that means that whatever conduct or insurgencies or any kind of acts were committed by the MPDC, the government would then impute it to the petitioner, pick him up, and then carry out the threat of death. Now, that's very important. That's critical. It goes to the well-founded fear standard, and in my opinion, it also goes to the withholding of removal standard, and it goes to the Convention Against Torture Standard, because that takes it out of the one-in-ten percent chance and puts us into the more likely-than-not category. We're withholding of removal. Are you relying on past persecution or on simply a well-founded fear of future persecution? Your Honor, we think that the petitioner has established both, that he has established the past persecution because of the included political opinion when he was arrested. His life and liberty are threatened. Every time he's arrested, and that's what happened to him when he was incarcerated during those time periods and subjected to the conditions that he was in the prison. On the well-founded fear standard, to go back to what the other difference is in this case, the fact that he is now on the MPDC red list. Now, there was a letter in the record, and I would direct the Court's attention to the exhibit number, from his friend that was in Senegal, and that was exhibit four, and the petitioner's opening briefs. And in that letter, his friend specifically states that the MPDC, which is the opposition group, has a red list of people that they're targeting. Now, these are the people, they're imputing their own people's political opinion of supporting the government. The petitioner is on that list, and that goes to the well-founded fear. Time flies. We'll give you some time for rebuttal, but we have your argument on hand. Let's hear from the government, but then we'll hear from you again. Okay. Thank you, Justice. Thank you. We'll use the full ten, but we won't cut you off on rebuttal. Thank you. Thank you. Good morning. May it please the Court, my name is Keith Bernstein, and I represent the Respondent Attorney General John Ashcroft. The relevant inquiry in this case, Your Honors, is whether or not the immigration judge's decision is supported by substantial evidence, and to warrant reversal of that decision. The question is exactly what is the immigration judge's decision. It's a little difficult to kind of figure out what he was saying. I'm sorry. It's a little hard to figure out exactly what the immigration judge was saying. Well, the immigration judge clearly found, Your Honor, that Petitioner did not establish past persecution based on the alleged incidents of detention. But even though they happened. So is that because they weren't severe enough, or because they weren't on behalf of political opinion, on account of political opinion, or because they're overridden by the civil strifer's concern? And if so, what's that? For all the reasons, Your Honor, that you mentioned. Specifically, the judge found that the incidents. Well, he did believe him, though. I beg your pardon? He did believe him. He certainly did. Other than a credibility issue, as Petitioner's counsel pointed out, Mr. Dunn was found credible, and his testimony was, therefore, believable. Nevertheless, the immigration judge specifically found that the incidents cited did not rise to the level of past persecution. Not only that, but in. As why? Well, Your Honor, as the Court has found, the past persecution, excuse me, is the infliction of suffering of harm on people in a way that is regarded as offensive. And two arrests in fairly miserable circumstances and a death threat aren't good enough. That's true, Your Honor, in light of the fact that the Court has also found that past persecution or persecution in general is a very extreme concept, and that not every form of mistreatment or harassment would fall within that definition. The Petitioner's detentions, while unfortunate and certainly, as he cited, under miserable conditions, do not necessarily rise to the level of past persecution. They're far less onerous than certain instances of persecution that this Court and other courts have found. Not only that, Your Honor, but as you pointed out, the immigration judge did have other reasons for denying the asylum application beyond not showing past persecution, either based on a past persecution or well-founded fear argument. The immigration judge found that there was no legitimate nexus. There was no on-account-of finding. Well, what does that mean if he was arrested for rebellious manifestations? Because it sounds sort of like, it sounds pretty much like political opinion. It does, Your Honor, in the sense that if, again, the one incident, the first arrest, involved a discussion between the police commissioner who arrested Mr. Dohm, indicating that he was trying to get him to sign a confession based, again, on these rebellious manifestations. But specifically within those discussions and during his two detentions, there was no indication that the police commissioner relied on Mr. Dohm's alleged participation with the MFDC. But did that matter? I beg your pardon? Why does that matter? Suppose he didn't belong to the MFDC, but he still was opposed to the government. Well, the Petitioner bears the burden of showing that his arrests were, in fact, motivated by What do rebellious manifestations mean? Well, in this context, Your Honor, supposedly it would mean the conflict between the MFDC, the people collectively within the Casamance region, and the Senegalese government. Rebellious manifestations in this sense, the government believes, was simply just the infighting or demonstrations, as it were. Right. That's not political opinion? If somebody goes and demonstrates against the government, and they choose to call it a rebellious manifestation, that's not political opinion? Well, there's no indication that Mr. Dohm actually participated in any of the alleged They believed he did. That's why they arrested him. But they have to have a reasonable basis, Your Honor, for believing that to be true. And Mr. Dohm indicated in his testimony, although he never indicated to the police commissioner, that he had already disaffiliated from the MFDC. I'm really confused by your argument. If he were arrested because they believed that he was participating in demonstrations against the government, i.e., because they had a political opinion they didn't care for, even if he didn't, isn't that under our law a basis for persecution? But the basis, Your Honor, he has to show also that he was singled out for that persecution. It would very well be an imputed political opinion if the police commissioner and any Senegalese officials incorrectly even or correctly believed that he was part of the insurgency. But in this particular case, the facts show that they had no reasonable basis to believe that. And the only reason that Mr. Ndom and others were arrested was collectively the people in the Casamance were believed to be rebellious. Now, when you say singled out, what do we know from the record as to how many people were arrested and treated in the same way he was treated? Well, all we know, Your Honor, from the record is what Mr. Ndom testified, is that when he was arrested, he was arrested with several other people or a group of people. But it doesn't sound as though all the people in the region or even all the members of the group were arrested. So singled out doesn't mean you're the only person arrested. It certainly shouldn't be sufficient for singling out that he was in a group or small group of people chosen from among the potential members of the group. So I'm not sure where your singled out argument takes you on the record here. Your Honor, I think the government's position stands that based on the evidence in the country report and based on Mr. Ndom's testimony itself, that the entire region was targeted for not necessarily for persecution. I mean, this is the conceptual problem in this case, then. So what is the line between the pattern and practice of persecution of a certain group, which makes it more likely to find a well-founded fear of persecution, as I understand it under the Riggs and under our case law, and civil strife, which makes it less likely? It sounds like the two are running directly into each other. What's the difference? Well, the difference, Your Honor, would be that if civil strife in and of itself were allowed to... Well, what is it? I want to know what it is. What is civil strife that's different from a pattern and practice of persecution? Well, I think a civil rebellion in the sense that where there's infighting between ethnicities or between... All right. Let's take Kosovo. We have a case whose name might be Hoxha, but I'm not sure anyway, which deals with Kosovo and which basically says, you know, if somebody came here from Kosovo at the time when Albanians were being terribly treated, they certainly have a much stronger case for persecution than other people do. But under your theory, they would have a weaker case because there would be civil strife because there was, as you just said, infighting between ethnic groups. But, Your Honor, it's important to realize that the immigration judge did not preclude a finding of asylum based on his... I'm asking a conceptual question. What is the difference? What is what you're calling civil strife? What is it? Your Honor, in this case, the immigration judge thought of civil strife specifically in relation to a small group, or no, I'm sorry, not a small group, a regional group of people in Senegal, actively and adamantly opposed to the central government. In this particular case, the immigration judge's decision to consider that an instance of civil strife cannot be reversed simply because you disagree with his finding. I don't disagree with it. I don't understand it. I don't know what standard he's applying. If I knew what standard he was applying for civil strife or what standard the statute applies, then I could evaluate it. But I don't know what standard is being applied here. Well, Your Honor, there's not necessarily a statutory standard that the immigration judge applied. I think it's important to realize that he did not rely solely on his decision that civil strife occurred and that, therefore, the incidents to which Mr. Ndung was subjected did not rise the level of past persecution. The immigration judge clearly applied the right, the appropriate standards as far as the statute is concerned with respect to an asylum finding. The fact that he concluded that the particular situation between the Casamance people and the Senegalese government is also equivalent to civil strife does not compel a reversal of his decision in this case. Again, Your Honor, not to believe – well, I won't belabor the point on civil strife, but the record also indicates that any alleged well-founded fear on behalf of the petitioner is mitigated and undermined by certain record evidence. Specifically, Petitioner's counsel referred to the State Department reports and the country reports within the record. They indicate that the Senegalese government and the leaders of the MFDC agreed to an immediate ceasefire in the Casamance in December of 1999. Petitioner also indicated that following his 1995 detention, his second arrest, he had no more problems with the Senegalese police or military or with the MFDC, for that matter. And in fact, he remained in Senegal for two more years before he left for the United States. Presumably, Your Honors, it's reasonable to expect that if he had truly suffered persecution and if he truly had a well-founded fear, he would have left the country sooner. He also failed to flee the country along with his family members when, in I think it was late 1994, early 1995, they proceeded to a refugee camp near the border of Gambia and then also proceeded to Gambia in 1997. Petitioner did not join them at that time but remained in Senegal. With respect to Petitioner's two other arguments regarding – well, specifically regarding withholding of removal, Petitioner's counsel suggested that the threat that was levied against Mr. Ndom during his – that by a police commissioner or a police official, that if he returned, he would somehow be killed. Mr. Ndom's speculation about what the police officer actually meant when he was threatening him cannot support a finding of – cannot support a withholding of removal grant in the fact that he hasn't shown that there's a clear probability. Okay. Thanks, Your Honor. No further questions. Your time has expired, unless the panel has further questions. Thank you, Your Honor. Thank you for your argument. Would you like a minute for rebuttal? Yes, please. Yes, thank you, Your Honor. I just wanted to point out a couple of things, Your Honor. First of all, we need to note that the immigration judge made a determination that when the petitioner was arrested, that his political activity was not the principal cause of why he was arrested. And that principal cause, throwing that in as a standard or analysis or a reason to state that, well, first of all, it's just speculation on the part of the immigration judge, because the immigration judge has no idea what's in the mind of the persons that arrested him. But then on the other hand, if we don't know what's in the mind of the person that arrested him, then we have to look at the objective factors. What were the objective factors? The nexus between the alleged insurgencies or whatever activity was being conducted by the NPDC and the fact that they would go and arrest the petitioner. The IJA find was the reason, was the principal reason. What did the IJA find was the principal reason? He didn't say. To my recollection, he didn't say. He just speculated that since this wasn't the principal reason and therefore there's no nexus, there's no on account of, it was just an escape hatch. Now, Your Honor, also, if I can state that in response to what was argued by the Government Counsel that Mr. Dumb has no way of knowing what's in the mind of the officer when he's threatening him with his life, I would just submit to the Court that the testimony of the respondent of the petitioner was found credible. And I think that any objective, reasonable person would be able to determine that he has a genuine fear. He meets both the subjective standard and the objective standard under the well-founded fear when he's told that the next time you come, the next time could be 5 years from now, 10 years from now, 20 years from now. And the respondent decided that he was not going to wait to find out what that would be. I do think, Your Honor, even under the ‑‑ there are two things here, as you know, for the standard of review. We have the de novo standard for the legal questions and the substantial evidence standard. Now, the petitioner has offered that ‑‑ I think we have the case pretty much well in hand. Okay. Thank you. Thank you very much for your rebuttal. Thank you. Thank both sides for their very helpful and good arguments. The case of Dahm v. Eshcroft is now submitted for decision. When you're ready. Thank you. Good morning. May it please the Court. My name is George Herides for Ryan Associates, appearing on behalf of the petitioner, Ghulam Mustafa. This is a petition for review of the Board of Immigration Appeals' decision, which affirmed, without opinion, the decision of the immigration judge. Therefore, the immigration judge's decision is the final agency determination of this case, which petitioner requests this Court to review for substantial evidence.
judges: Tg Nelson, W. Fletcher, Berzon